LULA J. EMERY v. NEW YORK LIFE INSURANCE COMPANY, Appellant. —295 S. W. 571.

Division One, April 11, 1927.

**1. LIFE INSURANCE: False Answers: Collusion between Applicant and Medical Examiner: Knowledge Imputable to Company.** If a person colludes with an agent to cheat the principal, the principal is not responsible for the knowledge or fraudulent acts of the agent. The principle that the knowledge of the medical examiner that the applicant for the life insurance policy had toxic goiter at the time her application was received and acted upon must be imputed to the company, has no application where the conduct of the examiner raises a clear presumption that he would not communicate such fact to his principal. And such a presumption arises where the applicant and the medical examiner join in an attempt to deceive the insurer and thus fraudulently obtain insurance.

**2. ———: ———: ———: Proof: Direct: Concealment.** Collusion between the agent and the applicant for life insurance need not be shown by direct evidence. Where the applicant knowingly and falsely answers a material question, and its falsity is known to the medical examiner who writes out the false answer and forwards the application to the insurer, which thereupon issues the policy, it will be presumed that there was collusion between the applicant and the agent. And in this case, though there was no specific finding by the court, sitting as a jury, that there was a collusion between the applicant and medical examiner, the conclusion is inescapable from the facts which the court did find that they were joint participants in the fraud attempted to be perpetuated upon the insurer.

**Held,** by ATWOOD, J., concurring, that though there was no finding by the trial court that there was a collusion between the applicant and the medical examiner and that the evidence does not justify a finding that they were joint participants in the attempted fraud, and the case was not tried on that theory, the judgment for plaintiff should nevertheless be reversed, because the applicant three months previously to her application had consulted a physician and been informed that she was af-

flicted with toxic goiter and in her answer to questions which plainly called for such facts falsely failed to state that she had consulted said physician or had ever had or been treated for said disease, which actually contributed to and was the direct cause of her death five months thereafter.

Corpus Juris-Cyc. References: **Agency**, 2 C. J., Section 549, p. 869, n. 10. **Insurance**, 32 C. J., Section 574, p. 1324, n. 47. **Life Insurance**, 37 C. J., Section 177, p. 455, n. 87; Section 410, p. 615, n. 40; Section 439, p. 636, n. 28.

Transferred from Springfield Court of Appeals.

REVERSED.

*Frank B. Williams* and *John T. Sturgis* for appellant.

(1) The evidence abundantly shows, and the court found as a fact, that the insured was at the time she applied for the insurance afflicted with a serious and dangerous disease which caused her death within six months and that she had knowledge of her condition. She made no mention of this in her medical examination but concealed and misrepresented her physical condition. Where the matter or thing misrepresented contributes to the death, as in the case here, the law as to material misrepresentations applies under our statute in all its vigor, and the policy is void. Benson v. Life Ins. Co., 161 Mo. App. 480; Smith v. Mystic Workers, 196 S. W. 62; Adams v. Amer. Patriots, 159 Mo. App. 340. (2) The only defense interposed is that the examining physician could and did during his examination discover the insured's affliction with goiter and that, notwithstanding, he also reported to the defendant that the applicant was free of disease, yet to his knowledge, casually obtained if at all, was the knowledge of the defendant. This is not a case, however, where the applicant honestly and correctly states the facts to the examining physician and he incorrectly records same, or where the answers are those of the examining physician and not of the applicant. Here the applicant solemnly states that she has read her answers and they are "written as made by me." The examining physician certifies that the answers are written by him "exactly as made by the applicant." If the physician did discover by the insured's mere appearance that her answers were false, then they colluded and conspired to defraud the defendant. This avoids the policy. 25 Cyc. 803; 14 R. C. L. 1177, secs. 252, 253; Mallen v. Life Association, 168 Mo. App. 503; Floyd v. Modern Woodmen, 166 Mo. App. 169; Elliot v. Maccabees, 88 Pac. 929, 13 L. R. A. (N. S.) 856; Equitable Life v. Hazelwood, 12 S. W. 621, 7 L. R. A. 217; Triple Line Indemnity Co. v. Williams, 26 So. 19, 77 Am. St. 34; Globe Ins. Co.

v. Duffy, 25 Atl. 227; Hook v. Michigan Mutual, 90 N. Y. Supp. 56; Centinental Life v. Porham, 16 S. W. 316; Maier v. Fidelity Mutual, 78 Fed. 566; Rinker v. Aetna Life Ins. Co., 64 Atl. 82, 112 A. S. R. 773. This case should be distinguished from the line of cases where the applicant is honest in making answers and the agent or examining physician is responsible for the form or truth, of the answer as he records it, or where the applicant trusts the agent that does not know or comprehend the answers made. In such cases the applicant's good faith and freedom from intentional misrepresentation acts as an estoppel. Shotliff v. Modern Woodmen, 100 Mo. App. 138; Hollenbeck & Co. v. Insurance Co., 133 Mo. App. 57; Beyer v. Insurance Co., 141 Mo. App. 589; Kirbs v. United Order of Foresters, 191 Mo. App. 538; Modern Woodmen v. Angle, 127 Mo. App. 100. (3) The insured further misrepresented and concealed the fact that she had within the last year (the question asked covered five years) consulted and been treated by a physician, Dr. Cox, for the very disease which contributed to and brought about her death. She was asked to give the names of all the physicians whom she had consulted or been treated by and for what illness or ailment and gave only Dr. Love for tonsils, though she had both consulted and been treated by Dr. Cox for the goiter which brought about her death. She had also consulted Dr. Hogeboom at the local Frisco Hospital and he told her she had goiter. All was misrepresentated or concealed. There is no pretense that the examining physician discovered this by merely looking at her, as he might have done as to the goiter itself. This was a misrepresentation as to a matter which contributed to her death and avoids the policy. Lynch v. Insurance Co., 150 Mo. App. 461; 14 R. C. L. 1174, sec. 253; 2 Cooley's Briefs on Insurance, 1166; 25 Cyc. 816; Lewis v. Life Ins. Co., 201 Mo. App. 48; McDermott v. Modern Woodmen, 97 Mo. App. 636; Aloe v. Mutual Reserve Ins. Co., 147 Mo. 561; Modern Woodmen v. Angle, 127 Mo. App. 102; Rigby v. Met. Life Ins. Co., 87 Atl. 428; Crosse v. Supreme Lodge, 254 Ill. 80; Timlin v. American Patriots, 95 Atl. 104; Mutual Life v. Hilton-Green, 241 U. S. 613; Aetna Life v. Moore, 231 U. S. 543; Gardner v. North State Life, 163 N. C. 367; March v. Mutual Life, 186 Pa. St. 629; Metropolitan Life v. Burbaker, 78 Kan. 146; Cobb v. Covenant Mutual Benefit, 153 Mass. 176; Sparer v. Travelers, 173 N. Y. Supp. 673; Lee v. New York Life, 80 So. 652; Mutual Life v. Hurni Packing Co., 260 Fed. 641.

*Hay & Flanagan* and *James E. Ruffin* for respondent.

(1) The principal is charged with the information of the agent, and whether the agent discloses same or not he is conclusively presumed to have done so. The examining physician was the agent of the defendant company. His information acquired in the performance

of his duty is the information of his principal. His duty required him to examine the insured. In the examination of the insured he acquired information of the existence of the goiter. That information was the information of the defendant. The examining physician was engaged by the defendant because he was a physician. As a physician he was enabled to make proper examinations, and as a physician he knew a goiter when he saw it. Shotliff v. Modern Woodmen, 100 Mo. App. 138; Johnson & Co. v. Insurance Co., 143 Mo. App. 441, 453; Cotten v. Fidelity Co., 41 Fed. 506. (2) The evidence discloses that the goiter was very perceptible and further that the examining physician inspected her neck and saw the goiter. The physician's knowledge was the knowledge of the defendant. Thomas v. Ins. Co., 20 Mo. App. 138; Bennett v. Standard Acc. Ins. Co., 237 S. W. 144; Modern Woodmen, 166 Mo. App. 166. (3) Aside from defendant's general denial its answer has for its purpose the cancellation of the policy after the death of the insured, which cannot be done. There is no allegation that any answer of the insured is a warranty. (4) The failure of the insured to inform the defendant of the names of physicians could not contribute to the death of the insured in this cause. No representation shall constitute a defense unless the fact misrepresented actually contributed to the death. Sec. 6142, R. S. 1919; Harms v. Casualty Co., 172 Mo. App. 241, 251; Dodt v. Ins. Co., 186 Mo. App. 175; Keller v. Ins. Co., 198 Mo. 440, 462. The defendant is not a fraternal society, and Section 6142 applies herein. (5) There is a distinction between the right of an insurance company to ask for a cancellation of a policy for misrepresentation prior to the death of the insured, and the right to interpose the misrepresentation as a defense to an action on the policy after the death of the insured. (6) A breach of warranty or a misrepresentation does not *ipso facto* render the policy void, but voidable merely at the option of the insurer. Life Ins. Co. v. Glaser, 245 Mo. 377, 389. After the death of the insured the misrepresentation about which the insurer complains must be shown to be material and must be concerning a fact which contributed to the death of the insured. (7) There is no evidence of any collusion between the insured and the examining physician, and even if there ever were the defendant did not so plead. Had insured intended to collude with the agent of the defendant she could have secured a policy for about one half the premium paid on the same company, but she chose the policy calling for the larger premium. (8) No direct question was asked of Pauline in regard to the existence of the goiter, and as the physician could see the goiter, there was no concealment. (9) Defendant does not plead that it was deceived by the failure to mention the goiter, and even had it so pleaded the knowledge of the examining physician would disprove the allegation. The

element of deception must enter before fraud can exist. Remmers v. Remmers, 217 Mo. 557.

RAGLAND, J.—This case comes to the writer for opinion on reassignment. It is a suit on a policy of life insurance. In the trial court there was a judgment for plaintiff. Defendant was allowed an appeal to the Springfield Court of Appeals, where the judgment was affirmed. One member of that court, dissenting from the conclusions reached by the majority, asked that the cause be certified to this court, which was accordingly done.

The policy in suit is for $1,000; it is a twenty-pay life old-line policy, bearing date, July 16, 1919. It was issued on the life of Pauline Emery, and plaintiff, the mother of said Pauline, is named as the beneficiary therein. The insured died on the 20th day of December, 1919, and this suit was brought to the May term, 1922, of the Circuit Court of Greene County.

The petition is conventional. The gist of the defense is embodied in the following excerpt from the answer:

"The defendant further says that the policy of insurance sued on herein was procured by fraud and false representations in the application therefor as to the physical condition and health of the said insured, Pauline Emery, as before stated, and by concealment of the fact that she was then afflicted with the disease of goiter, which disease later caused her death; and had not consulted other physicians; that said false representations and concealments were material and rendered said policy null and void; that the said incomplete and untruthful answers of the insured, as to her health and physical condition, and the misrepresentations and concealments, as to her being afflicted with goiter and having been treated by physicians, rendered said policy contract void and same never took effect or became a valid and binding obligation of this defendant."

The reply is as follows:

"Now comes the plaintiff in the above styled cause and for reply to the defendant's amended answer, denies each and every allegation therein contained. And plaintiff, for further reply, says that defendant's medical examiner examined the insured as a part of the application and said examiner at the time saw or by the exercise of ordinary care could have seen the goiter at the time and defendant is estopped from claiming it was unaware of its existence."

Attached to and forming a part of said Pauline Emery's application for the policy sued on were certain questions propounded to her by defendant's local medical examiner and her answers thereto. That part of the application, so far as material to the controversy here, was as follows:

"The applicant must answer these questions fully and with special care:

"8.   Have you ever suffered from any ailment or disease of:

"A.   The brain or nervous system?   A.   No.

"B.   The heart or lungs?   A.   Yes, pneumonia, 1913.   Duration 10 days.   Light.   Result, recovery.

"C.   The stomach or intestines, liver, kidneys, or bladder?   A.   No.

"D.   The skin, middle ear, or eyes?   A.   No.

"9.   A.   Have you ever had rheumatism, gout, or syphilis?   A. No.

"B.   Have you ever raised or spat blood; if so, give full details? A.   No.

"C.   Have you ever had any accident or injury?   A.   No.

"D.   Have you ever consulted a physician for any ailment or disease not included in your above answers?   A.   No.

"E.   What physician or physicians, if any, not named above, have you consulted or been treated by within the last five years, and for what illness or ailment?   A.   Dr. J. W. Love, Springfield, Missouri, April 9, 1919.   Tonsils removed.   Results good.

"I agree, represent, and declare, on behalf of myself and of every person who shall have or claim any benefit in any insurance made hereunder, that I have carefully read each and all of the above answers, that they are each written as made by me, that each of them is full, complete and true, and that I am a proper subject for life insurance.   Each and all of my said statements, representations, and answers contained in this application are made by me to obtain said insurance, and I understand and agree that they are each material to the risk, and that the company, believing them to be true, will rely and act upon them.

"Dated this 15th day of July, 1919.

"Witnessed by:                          Signature of person
  ALBERT F. WILLER, M. D.,                applying for insurance:
    Medical Examiner.                     PAULINE EMERY."

In connection with the application just referred to there was forwarded to defendant the report of its local examiner, which was in part as follows:

"Do you find any evidence of past or present disease?   No.

"A.   Of the brain or nervous system?   No.

"B.   Of the heart?   No.

"C.   Of the lungs?   No.

"D.   Of the stomach or any of the abdominal organs?   No.

"E.   Rheumatism or gout?   No.

"F.   Of the skin, middle ear, eyes, or any other part of the body? No.

"Q.   Do you know anything about the applicant's character or mode of life which unfavorably affects his insurability?   A.   No.

316 Mo.—82.

"Q. Have you reviewed all answers on this and on the reverse side, and are they as far as you know full, complete, and true answers? Yes.

"I certify that I have carefully examined Pauline Emery of Springfield, Missouri, in private, and not in the presence of any third person, this 15th day of July, 1919, 5:30 o'clock, P. M., for insurance of $1,000 on the applicant's life; that I have asked each of the questions exactly as set forth on the other side of this sheet, and that the applicant's answers thereto are in my handwriting and are exactly as made by the applicant to me, and that this applicant signed them in my presence.

"(Signed)    Albert F. Willer, M.D.
"Springfield, Missouri."

At the time of making the application for insurance Pauline Emery was employed as a clerk in the offices of the Frisco Railroad Company at Springfield, Missouri, and it seems had been so employed for sometime prior thereto. In September, 1918, she consulted a practicing physician of Springfield (Dr. Cox) with reference to an ailment with which she was suffering, and he diagnosed it as exophthalmic or toxic goiter, the form that affects the heart, the nervous, the circulatory and the digestive systems. He prescribed for her and advised her as to the nature and seriousness of her trouble. In January she consulted a physician at the Frisco Hospital at Springfield. Shortly thereafter she told a friend that she would be compelled to go to St. Louis for an operation for goiter, but expressed an unwillingness to submit to the operation until she had seen her brother, who had been a soldier in the World War and was still overseas. On July 15th she made the application for insurance which has heretofore been quoted in part; on July 17th she obtained from her employer a permit to enter its general hospital in St. Louis for treatment; and on the second day of August she entered that hospital. At that time she told the physician in charge that her thyroid gland had become enlarged about a year before and had gradually grown larger; that for the past six months she had noticed herself being nervous and had felt weak; that for four months she had had exophthalmia (protrusion of the eye-balls); and that for six months her heart had beat hard and fast and she had had tremor of the hands. On September 2nd a preliminary operation was performed; on December 17th the final one; and on December 20th she died of broncho-pneumonia, superinduced by the ether which had been used as an anaesthetic.

With reference to what they had observed at the time Pauline was being examined by defendant's local examiner, in connection with her application for insurance, both plaintiff and another of her daughters, Ellen, testified:

Ellen said: "They were standing at the window. I saw the doctor looking at her face and neck. The shades were rolled to the top and

the curtains pulled back. It was light enough to see. I have seen my sister's goiter. I think it could be readily seen.''

Plaintiff testified: ''I saw them standing close to the window and the doctor seemed to be looking in her face and at her neck. She had on a low-neck dress. This goiter could readily be seen at that time. . . . The goiter was enlarged quite a good deal on both sides. The left side was larger than the right. I had known for sometime that she had a goiter.''

The foregoing is a brief summary of the facts as disclosed by the evidence bearing on the knowledge possessed by both Pauline Emery and defendant's local examiner, at the time the application and the medical report were signed by them respectively, with reference to the existence and nature of the disease with which she was then afflicted.

The case was tried to the court and it found the facts to be as follows:

''1.   That at the time the insured, Pauline Emery, applied for the insurance sued on and signed her medical examination she was afflicted with the disease of goiter.

''2.   That she then knew of her said affliction.

''3.   That she then contemplated going to a hospital for the treatment of said disease.

''4.   That she made no mention of her affliction in her written application and medical examination, but concealed the same.

''5.   That her then disease of goiter caused her, shortly thereafter, to undergo an operation therefor, resulting in pneumonia and death.

''6.   That her said disease thereby contributed to her death.

''7.   The court further finds, however, that the disease of goiter, with which the insured, Pauline Emery, was afflicted, was then so far developed and the symptoms so prominent that the local physician of defendant, by the exercise of ordinary care in making his examination, could have discovered it, and did discover it and know about it.

''8.   The court also finds that the insured had, within the past five years before her said application and medical examination, consulted and been treated by physicians whose names were not disclosed therein, and one of same, Dr. Cox, knew of and had advised her concerning her goiter.''

These findings were amply sustained by the evidence.

The trial court's finding of the issues for the plaintiff was evidently based on the theory that the knowledge of defendant's local medical examiner was imputable to it, because there was no suggestion in the evidence that any other officer or agent of the company knew of Pauline Emery's having the disease of goiter, at the time her application for insurance was received and acted upon. But the principle that the knowledge of an agent must be imputed to his principal is entirely inapplicable in a case where the conduct of the agent raises a

clear presumption that he would not communicate the fact in controversy. [21 R. C. L. 843.] And such a presumption arises where the agent and the applicant for insurance join in an attempt tó deceive the insurer and thus fraudulently procure insurance. An agent thus acting is not only stepping outside the limits of his authority, but is known to the applicant to be doing so. [Tripple Link Mutual Ins. Assn. v. Williams, 121 Ala. 138; Mudge v. Supreme Court, 149 Mich. 467; Rinker v. Insurance Company, 214 Pa. St. 608; Elliott v. Knights of Modern Maccabees, 46 Wash. 320; Mutual Aid Union v. Blacknall, 196 S. W. (Ark.) 792; Ryan v. Insurance Company, 41 Conn. 168; Sprinkle v. Knight Templar, 124 N. C. 405.]

"If a person colludes with an agent to cheat the principal, the latter is not responsible for the acts or knowledge of the agent. The rule which charges the principal with what the agent knows is for the protection of innocent third persons, and not those who use the agent to further their own frauds upon the principal." [National Life Ins. Co. v. Minch, 53 N. Y. 144, 150.]

It is not necessary that collusion on the part of the applicant and the agent be shown by direct evidence. Where an applicant falsely answers a question, and such falsity being known to the agent, he nevertheless writes out the answer and forwards the application to the insurer, who issues a policy thereon, it will be presumed that there was collusion between the applicant and the agent. [Tripple Link Mutual Ins. Assn. v. Williams, supra.] In the instant case there was no specific finding by the court of collusion between the applicant and the medical examiner, but from the facts which the court did find the conclusion is inescapable that they were joint participants in the fraud attempted to be perpetrated upon defendant.

It follows that the judgment of the trial court must be reversed. It is so ordered. *Graves, P. J.,* and *Atwood, J.,* concur, *Atwood, J.,* in separate opinion; *Gantt, J.,* not sitting.

ATWOOD, J., (concurring).—Neither the trial court nor the Springfield Court of Appeals found any collusion between the applicant and the insurer's medical examiner. The case was not tried below on that theory, and as I read the record it does not justify a finding "that they were joint participants" in a "fraud attempted to be perpetrated upon defendant."

However, it does not follow that respondent should recover. The case was tried as an action at law before the court sitting as a jury. The policy was issued on the "stipulated premium plan," and alleged misrepresentations made in securing the same should be ruled as provided in Section 6192, Revised Statutes 1919, which is as follows:

"No representation made in obtaining or securing a policy of insurance on the life or lives of any person or persons shall be deemed

material, or render the policy void, unless the matter misrepresented shall have actually contributed to the contingency or event on which the policy is to become due and payable, and if so contributed in any case, shall be a question for the jury.''

Misrepresentations are complained of in the following questions and answers constituting a part of the insured's written application, which answers the insured said elsewhere in her application were ''full, complete and true:''

''D. . Have you ever consulted a physician for any ailment or disease not included in your above answers? A. No.

''E. What physician or physicians, if any, not named above, have you consulted or been treated by within the last five years, and for what illness or ailment? A. Dr. J. W. Love, Springfield, Missouri, April 9, 1919. Tonsils removed. Results good.''

The uncontradicted evidence is that in September, 1918, less than one year immediately preceding the date of this signed application, the insured consulted Dr. Lee Cox, of Springfield, Missouri, who diagnosed her case, concluded that she had exophthalmic or toxic goiter, and prescribed for her on that account. Question E plainly called for the facts that the applicant had consulted Dr. Cox and that he had treated her for toxic goiter, and her subsequent representation in the application that all of her answers, including this one, were ''full, complete and true,'' was false. Her written application, therefore, contained a misrepresentation which not only directly concealed from defendant the fact that she had within the past year consulted a physician who had treated her for toxic goiter, but indirectly and effectually concealed from defendant the fact that at the time she signed the application she had toxic goiter. This misrepresentation fully sustained the trial court's finding that ''she made no mention of her affliction in her written application and medical examination but concealed the same.'' The trial court further properly found that ''her then disease of goiter caused her, shortly thereafter, to undergo an operation therefor, resulting in pneumonia and death'' and ''that her said disease thereby contributed to her death.''

While it may be that defendant's medical examiner, as the trial court found, knew that the applicant had a goiter, it does not follow that he knew she had exophthalmic or toxic goiter, and as Dr. Harrison, testifying for defendant, said it is the person having the latter form of disease who ''is not deemed insurable by insurance companies generally.'' While rapid pulse and protrusion of the eyes are symptoms of this form of goiter, he further testified that ''the local examiner does not always discover this ailment, as the symptoms are sometimes intermittent and protrusion of the eyes does not always accompany the toxic form.'' I find no evidence that at or prior to the date of her written application the symptom of protrusion of the

eyes had appeared, unless it be the testimony of Dr. O. O. Smith, who examined the insured on her admission to the hospital in St. Louis on August 2, 1919, to the effect that he "got the information from her that she had exophthalmia for the past four months." It is significant that this information apparently came from the patient's own history of her case rather than from this physician's examination of her. This circumstance in evidence, considered in the light of the above mentioned testimony of Dr. Harrison that the symptoms of this particular ailment "are sometimes intermittent," makes it by no means certain, if not improbable, that this symptom was apparent when the insurer's medical examiner examined her and made his report to defendant on July 15, 1919. From the abstract of Dr. Cox's testimony it appears that his diagnosis was based upon effects observed upon this patient's nerves and circulation. As to the exterior appearance of the goiter the applicant's mother and sister testified that it could be "readily seen." Dr. Cox testified that "it was not a large goiter." Mattie Schuler, who worked with the applicant in the Frisco Office Building at Springfield, testified, "I saw her almost every day in and about the building where we worked and was with her in a social way," and further said that she did not know she had a goiter until some two or three weeks before she went to the hospital in St. Louis early in August, 1919, when she told her that "the doctors thought she had a goiter and she would probably have to go to St. Louis to be operated on." B. O. Chandler, chief clerk in the transportation department of the Frisco, issued a hospital permit to the insured on July 17, 1919, and she talked to him about an operation. He and she worked at the same desk, sitting just opposite each other, and he testified that he didn't know she had a goiter until she told him about it, that he "had never noticed it." However the applicant's appearance may have impressed the medical examiner, there is nothing in the record to indicate that he knew that the applicant had exophthalmic or toxic goiter, or that he knew that her answer to question E was not "full, complete and true." Defendant and its medical examiner were entitled to have a "full, true and complete" answer to this question, and if given it would have disclosed that she had a goiter, that it had been pronounced toxic and was of such a serious nature as to require the treatment of a physician. The matter misrepresented in the insured's written application thus effectually concealed from the insurer the fact that she had exophthalmic or toxic goiter, and so actually contributed to the contingency or event on which the policy was to become due and payable, that is, the death of the insured. Of the existence of this fact it does not appear that defendant's medical examiner had any knowledge. It follows that the trial court erred in not finding for defendant, and the majority opinion properly holds that the judgment should be reversed.